# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CASE NO. 06-1356-DWB |
| ) | |
| $31,323.00 UNITED STATES ) | |
| CURRENCY, ) | |
| ) | |
| Defendant ) | |
| ) | |
| RYON SULLIVENT, ) | |
| ) | |
| Claimant. ) | |
| ) | |

## MEMORANDUM AND ORDER

This is an action for the forfeiture of defendant $31,323.00 in U.S. Currency pursuant to 21 U.S.C. § 881, 18 U.S.C. § 983, and the Supplemental Rules for Admiralty or Maritime and Asset Forfeiture Claims. The Court has subject matter jurisdiction under 28 U.S.C. § 1345 and 1355, and such jurisdiction is not disputed.[1] The court's personal jurisdiction over the parties is not disputed and the parties also stipulate that venue properly rests with this court pursuant to 28 U.S.C. § 1355 and 1395.

---

[1] The parties in this case consented to trial before a U.S. Magistrate Judge pursuant to 18 U.S.C. § 36(c). (Doc. 8.)

## FACTS

In the Pretrial Order (Doc. 20), the parties entered into the following stipulation of uncontroverted facts:

1. On March 19, 2006, claimant was lawfully stopped by Kansas Highway Patrol Trooper Doug Carr for a traffic violation on I-70 at milepost 132 in Trego County, Kansas.

2. Upon approaching the car, Trooper Carr smelled the odor of marijuana coming from the car.

3. Trooper Carr discovered approximately 2 grams of marijuana in a plastic baggie on the vehicle's back seat.

4. Trooper Carr discovered in a book bag in the trunk the following items: approximately 1 ounce of marijuana, 2 boxes of 1-gallon plastic bags, a plastic bag heat sealer, an electronic scale, $30,860.00 of defendant currency, and a loaded 9mm handgun.

5. A trained and certified Kansas Highway Patrol drug K-9 alerted to the odor of narcotics on the defendant currency.

6. $563.00 of defendant currency was located on the person of claimant.

(Doc. 20 at 2.)

The case proceeded to trial before the Court on January 12, 2008. The

Government appeared through Special Assistant U.S. Attorney Colin Woods. Claimant Ryon Sullivant appeared through counsel Tom Boone. The parties waived opening statements and the Government proceeded with its case-in-chief.

The Government first recited and incorporated the uncontroverted facts set forth in the Pretrial Order. It then offered the following exhibits:

        Government Ex. 1        deposition of Clamant, Ryon Sullivent

        Government Ex. 2        deposition of John Shelton, and

        Government Ex. 3        photograph of the subject currency.

There was no objection and these exhibits were admitted into evidence.

The Government then called Kansas Highway Patrol Trooper Doug Carr as a witness. Carr testified about his stop of an automobile driven by Claimant for speeding. Carr smelled the odor of burnt marijuana, noted that the passenger was smoking, and proceeded to search the automobile. In the back seat he found 1-2 grams of marijuana. In the trunk, in addition to clothes, Carr found a black bag, a heat sealer, two boxes of plastic baggies, a digital scale, and one ounce of marijuana in a sealed plastic baggie. He also found a loaded 9 mm Lugar pistol, a fifteen-round clip loaded with hollow-point shells, and a ten-round clip. In a shoe box inside the black bag, Carr found approximately $30,000 in currency. Approximately $500 in currency was found on Claimant's person. Trooper Carr

identified the following exhibits which were offered and admitted without objection:

| | | |
|---|---|---|
| Government Ex. 4 | | a 9 mm Lugar pistol |
| Government Ex. 5 | | a digital scale |
| Government Ex. 6 | | two boxes of plastic baggies, with one baggie missing from one of the boxes[2] |
| Government Ex. 7 | | a heat sealer |
| Government Ex. 8 | | marijuana taken from the back seat of the automobile and located inside a small plastic baggie which had been field tested and subsequently lab tested and found to be marijuana |
| Government Ex. 9 | | marijuana taken from the black bag found in the trunk of the automobile which was also tested and found to be marijuana |
| Government Ex. 10 | | a black bag found in the trunk of the automobile which contained all of the above-items except for the 9 mm Lugar. |

On cross-examination, Trooper Carr testified that Claimant was put through standard field tests at the time of the traffic stop and was found to be impaired, but not so significantly that he could not drive. The passenger, John Shelton, was "stoned" and admitted smoking marijuana. Carr also testified about later

---

[2] There were a total of 29 baggies remaining in the two boxes.

4

interviews with the passenger and that Shelton stated that he did not know about the money in the trunk, did not know what was in the bag, but had seen some money while in a hotel room with Claimant.  Shelton said that they were on a trip from their home in Oklahoma to California over spring break.  They did not buy any marijuana in San Diego, Los Angeles or San Francisco, but did purchase some in Fort Collins, Colorado on their way home.  Shelton understood that the money Claimant had came from an insurance claim for an automobile owned by Claimant which had been wrecked, but he had no personal knowledge of the source of the money.  Shelton also stated that he had purchased drugs from Claimant when they were in high school together.

     The Government then called Agent Mike Keesling as a witness.  Keesling has spent twelve years on the drug task force, was the affiant in this case, and went to Oklahoma City to interview John Shelton.  From his experience, Keesling testified about the relevance of the items admitted as Government's Ex's 4-10 in connection with characteristic drug transactions.  The gun would be for protection for the money and drugs; plastic baggies are used to package drugs, digital scales are to weigh drugs that are being sold/purchased; sealers are used to hide the odor of drugs; cash is normally used in drug transactions because it is not traceable and cash used in drug transactions is usually bundled in groups by denomination with a

bundle often containing $1,000, and then grouped with other bundles in larger bundles of $5,000 or $10,000. Keesling testified that the "dealer-to-dealer" price of marijuana on the West Coast varies greatly, but that in 2006 the average price would be approximately $600 per pound. He testified that the size of baggies found in the car would hold approximately one pound of marijuana.

On cross-examination, Keesling testified about his interview of Shelton, but stated that Shelton's statement was not relied upon in deciding to pursue the present case because the evidence was sufficient without needing Shelton's statement.

The Government then rested.[3]

Claimant Ryon Sullivent testified as a witness. He is a 24 year old undergraduate student at Oral Roberts University studying theology. He testified that he Shelton took a trip together to California during spring break using Shelton's car, but with Claimant paying the expenses of the trip. Claimant stated that a large portion of the money he took on the trip came from an insurance claim he had made for a Lexus automobile which he had purchased in New York and

---

[3] The Government also relied on the Affidavit of Ryon Sulllivent which had been filed in this case as part of Claimant's Answer. (Doc. 5-2.) The affidavit, however, was not marked as a trial exhibit. The Affidavit included the statement that Claimant entered a plea to possession of drug paraphernalia on August 8, 2006, in Trego County Case No. 06-CR-19 in the District Court of Trego County, Kansas, arising out of the 2006 traffic stop and arrest which is also the basis for the present forfeiture action.

which was later wrecked in Oklahoma. Other moneys came from his sale of other property such as stereo components. Claimant characterized himself as kind of a trader who acquired and sold property, and he testified that he had previously purchase and re-sold ten automobiles and had made money on all of them.

Claimant testified that he had used marijuana for recreational purposes, but that the money he took on the trip was not to purchase marijuana or other illegal drugs. On their trip, Claimant and Shelton stopped in San Diego, Los Angeles and San Francisco, California. Claimant testified that he wanted to find another automobile to buy, but that he did not see any that he was interested in buying. Claimant indicated that he purchased the digital scale in San Diego to weigh things with, but that he had never weighed marijuana before. His wife had purchased the sealer to seal left-overs, and he took it on the trip because he was "in to organic food." He used the sealer only one time in Fort Collins, Colorado to seal a bag of marijuana he had purchased there. He never bagged any food with the sealer. Claimant had purchased the Lugar two years before the trip because he was enthused with pistols and got one when he was old enough to get a permit.

Claimant testified that he did buy marijuana in Fort Collins, Colorado, and that he, Shelton and a friend they were staying with in Fort Collins all used the marijuana. He had approximately $563 on his person which he was spending on

trip expenses and if he needed more, he would get it from the trunk. Claimant testified about two prior instances where he had been involved in drug offenses, both when he was 18 years old. In the first instance in 2002, he was in a car with others and he took the blame for possession of marijuana. He was charged, but the charges were later dismissed. The second instance was similar. He and a friend were riding in a car when they saw they were about to be pulled over by police. Claimant was driving and the friend wanted to get out before they were stopped because the friend had some marijuana. When the friend got out of the car, he left the marijuana, and Claimant pled guilty to possession of that marijuana. Claimant also indicated that he had obtained marijuana for Shelton in the past.

On cross-examination, Claimant was asked about statements he had made in the affidavit he signed and filed with his Answer in this case. In paragraph 7 of the affidavit, Claimant had stated that he was "on a trip with a friend looking for cars and hoping to find a replacement for the one he had lost on the ice." (Doc. 5-2 at ¶ 7.) In his trial testimony, Claimant stated that he "looked" for cars in the newspapers while on the trip, but that he never physically looked at any cars because none he saw advertised in the newspapers interested him.

Claimant's mother, Vicki Davis, also testified as a witness. She stated that Claimant was an only child, and that she and her husband were now divorced. She

admitted that it was unusual to carry $30,000 on your person, but that Ryon had carried large amounts of case in the past and that he learned this from his father who carried a lot of cash too. She characterized Claimant as "kind of a trader" like his father.

Claimant then rested.[4]

After hearing closing arguments from counsel, the Court took the case under advisement. Having now reviewed the testimony and exhibits introduced at trial, the Court is prepared to rule.

## DISCUSSION

As stated in the Pretrial Order, this forfeiture case is brought pursuant to 21 U.S.C. § 881, 18 U.S.C. § 983, and the Supplemental Rules for Admiralty or Maritime and Asset Forfeiture Claims. The Complaint was filed on December 1, 2006, and therefore the Civil Asset Forfeiture Reform Act of 2000 (CAFRA) applies. *See* United States v. Wagoner County Real Estate, 278 F.3d 1091, 1095 n. 1 (10th Cir. 2002) (noting CAFRA's effective date of August 23, 2000).

---

[4] In the Pretrial Order, the parties stipulated that the numerous documents could be introduced into evidence at trial subject to objection based solely on the grounds of relevance. (Doc. 20 at 3.) Claimant did not have copies of those documents with him to mark as exhibits at trial, but was allowed, without objection, to forward copies to the court after trial. Claimant did so and submitted documents identified in the Pretrial Order showing the sources of the moneys Claimant had in his possession when he was stopped. *See* Doc. 20 at 3 ¶¶ 4(b)(1) through (b)(7). To complete the record in this case, the Court is having these documents marked as Claimant's Exhibit A and they are made part of the record.

In this case, the burden is on the Government to establish by a preponderance of the evidence that the property is subject to forfeiture.  18 U.S.C. § 983(c)(1); U.S. v. $252,300 in U.S. Currency, 484 F.3d 1271, 1273 (10th Cir. 2007).  A preponderance of the evidence means that the evidence, considered in light of all the facts, proves that something is more likely so than not so.  Harvey v. General Motors Corp., 873 F.2d 1343, 1350 (10th Cir. 1989).  *See also* TENTH CIRCUIT, PATTERN JURY INSTRUCTIONS (Criminal) (2005 Edition), §  1.05.1 ("Preponderance of evidence is evidence sufficient to persuade you that a fact is more likely present than not present.")

Property which is subject to forfeiture is described in 21 U.S.C. § 881(a)(6) to include

> All moneys . . . furnished or intended to be furnished by
> any person in exchange for a controlled substance or
> listed chemical in violation of this subchapter
>    *   *   *
> and all moneys . . . used or intended to be used to
> facilitate any violation of this subchapter.

And, if the Government's theory of forfeiture is that the property or money was used or intended to be used to commit or facilitate the commission of a criminal offense, as it is in this case, then the Government must also establish that there was a "substantial connection" between the property and the offense.  18 U.S.C. § 983(c)(3); U.S. v. $252,300 in U.S. Currency, 484 F.3d at 1273.   *See also* Stefan

D. Casella, ASSET FORFEITURE LAW IN THE UNITED STATES, § 11-2, p. 382 n. 20.

The Government's theory in this case is set out in the Pretrial Order:

> Plaintiff contends that $30,860.00 of defendant currency is forfeitable to the United States because the currency was intended to be furnished in exchange for a controlled substance in violation of 21 U.S.C. § 881 (a)(6). Plaintiff further contends that $563.00 of defendant currency was used or intended to be used to facilitate an intended exchange for a controlled substance.

(Doc. 20 at 4.)  Claimant's position is likewise set out in the Pretrial Order:

> Claimant contends that the sum of $31,323.00 is accounted for and should be returned to the claimant. Claimant contends that the funds are all derived from different sources and that it was not intended to be used for the purchase of controlled substances.

(Doc. 20 at 5.)

In determining whether the Government has established by a preponderance of the evidence that there is a substantial connection between the subject currency and a controlled substance, the Court must assess the legal significance of the facts surrounding the seizure and determine whether the facts are probative and the weight to be accorded to each fact.  U.S. v. $252,300 in U.S. Currency, 484 F.3d at 1274.  In doing so, the Court is to use a common-sense approach which considers the totality of the evidence as a whole and in the appropriate context.  *Id.*

1.     The Amount and Packaging of the Currency

The Tenth Circuit has noted that a large amount of currency, while not alone sufficient to establish a connection to a drug transaction, is "strong evidence" of such a connection. United States v. $149,442.43 in U.S. Currency, 965 F.2d 868, 877 (10th Cir. 1992). Likewise, the way that the currency is wrapped or bundled may evidence a technique known to be used by drug dealers. *See e.g.*, U.S. v. $252,300 in U.S. Currency, 484 F.3d at 1275 (wrapping currency in cellophane to prevent discovery by drug-sniffing dogs and noting that legitimate businesses do not transport large quantities of cash rubber-banded into bundles); United States v. $189,825 in U.S. Currency, 216 F.3d 1089 (Table), 2000 WL 870500 at * 6 (10th Cir. 2000).

In this case, the amount of cash found on Claimant's person and in the trunk of the car in which he was riding was substantial, particularly considering Claimant's young age and the relatively small amount of taxable income reported by Claimant and his wife in the years immediately preceding, and including, the time of the traffic stop in this case.[5] The testimony of Agent Keesling about his experience involving the packaging of currency in drug transactions also indicates

---

[5] Joint tax returns for Claimant and his wife showed adjusted gross income of $8,702 for 2004; $9,184 for 2005; and $13,643 for 2006. Government Ex. 1, Deposition of Ryon Sullivent, Depos. Ex's 1, 2 & 3.

12

that the way the currency was bundled in this case is similar, if not identical, to the technique often used by drug dealers.

Offsetting this is the evidence presented by Claimant showing the legitimate sources of the funds he had with him when stopped, and his mother's testimony that Claimant was "a trader" and tended to carry cash on his person as he learned from his father. As an initial matter, the Government contended in its Trial Brief (Doc. 25 at 3) and at trial, that Claimant's evidence concerning the fact that the subject moneys came from legitimate sources is irrelevant where, as here, the Government's theory is that the money was furnished or intended to be furnished for the purchase of controlled substances and not that the money is proceeds of a drug transaction. Therefore, the Government did not dispute Claimant's evidence about the sources of the funds.[6]

The Government is correct that the fact that Claimant obtained the subject moneys from his past buying and selling of various types of property, and from insurance proceeds for damage to such property, does not relate *directly* to the question of whether Claimant intended to use the moneys to purchase or facilitate

---

[6] The Court notes that unlike many cases where a Claimant merely alleges that the funds were from a legitimate source without producing any supporting evidence, *see e.g.*, United States v. $4,629 in U.S. Currency, 359 F.Supp.2d 504, 509 (W.D.Va. 2005) and U.S. v. $252,300 in U.S. Currency, 484 F.3d at 1273, 1275, here Claimant produced specific documentation of the sources of the funds. The majority of the these documents reflected amounts received by Claimant within a short time prior to the time he was stopped.

13

the purchase of controlled substances in the future. *See e.g.*, United States v. U.S. Currency in the Amount of $40,000, 1999 WL 1011938 at * 4 (E.D.N.Y. 1999) (under section 881(a)(6), whether claimant actually derived cash from gambling winnings as he claimed is irrelevant; if he intended to exchange it for a controlled substance, the legitimate source doesn't matter). The source of the funds does however, relate to Claimant's overall argument that he had the funds with him to acquire more legitimate property *i.e.*, a replacement automobile, rather than illegal drugs. Thus the evidence has some relevance and has been considered by the Court in reaching its decision in this case. While the amount and packaging of the money is probative evidence of a drug-related transaction that is entitled to some weight, it is not, by itself, conclusive.

  2.  The presence of the 9 mm Lugar

Agent Keesling also testified that persons engaged in buying or selling controlled substances often carry firearms to protect themselves and their money from theft by others involved in the drug transaction. However, protection of legitimate funds from theft could also explain the presence of a firearm, thus this factor too, while probative and entitled to some weight, is not conclusive.

3. <u>Claimant's history concerning controlled substances</u>

Claimant did not deny that he had engaged in the recreational use of marijuana or that he had in the past provided controlled substances to Shelton, or at least assisted Shelton in finding drugs. His two prior brushes with law enforcement concerning possession of marijuana and his admission that he, Shelton and their Fort Collins friend all used the marijuana purchased in Fort Collins, Colorado, demonstrate a propensity on Claimant's part to seek and use controlled substances. The Government does not have to prove that the drugs Claimant intended to buy were for re-sale rather than for his own personal use.

4. <u>The digital scale, the plastic baggies and the heat sealer</u>

It is Claimant's possession of these items that causes Claimant's story about the reason for the trip to California to break down. Claimant's explanation as to why he had these particular items with him during his trip to California is simply not credible. Claimant indicated that he purchased the digital scale in San Diego to weigh things with, but he was unable to state specifically what he intended to weigh or why he bought the scales on this trip. He testified that his wife had purchased the heat sealer to seal left-overs, and he took it on the trip because he was "in to organic food." However, he admittedly used the sealer only one time in Fort Collins, Colorado to seal a bag of marijuana he had purchased there, and he

never bagged any food – organic or not – with the sealer.  Likewise, the only plastic baggie that he used from the two boxes found in his bag was used to hold the marijuana purchased in Fort Collins, Colorado.  The presence of these three items, all of which Agent Keesling testified are commonly found in drug transactions for the weighing and packaging of controlled substances, is strong evidence that Claimant intended to purchase controlled substances at some point in his trip to California.  Claimant's possession of these three items, and his incredible story about why he had them in his possession on this trip, undermines his claim that he took the California trip to look for a replacement automobile.

Considering all the evidence, and using a common-sense approach which considers the totality of the evidence as a whole and in the appropriate context, the Court finds that the Government has established by a preponderance of the evidence that *some* of the Defendant currency, both that in the trunk and on Claimant's person, were intended to be used or furnished, *at least in part*, for the purchase of a controlled substance.  Therefore, the Court also finds that there is a substantial connection between at least *some* of the moneys and an intended purchase of controlled substances.  This then raises the question of how much of the currency is subject to forfeiture.  That issue has not been addressed by the parties, each of whom take an all-or-nothing approach – either all the funds are

subject to forfeiture or none of the funds are subject to forfeiture.  The Court does not agree.

The evidence about Claimant's intended use of the currency in this case is wholly circumstantial.  On the one hand, the Government's testimony through Agent Keesling is that marijuana in California during the relevant time period was selling for $600 per pound and that the size of plastic baggies discovered in Claimant's black bag would each hold approximately one pound of marijuana.  Claimant had with him two boxes of plastic bags containing a total of 30 baggies.  Therefore, the evidence supports a finding that Claimant had the means and presumed intent to purchase enough marijuana at some time during his California trip to fill up to the 30 plastic bags he brought with him which would cost  up to $18,000 ($600 x 30 bags).  He clearly had funds sufficient to purchase that amount.

On the other hand, the Government's evidence about Claimant's intent to purchase any greater quantity of marijuana is more problematic.  While 30 pounds of marijuana is not an inconsequential amount, it is not sufficiently large to indicate that Claimant was a drug dealer as opposed to a user of marijuana for recreational purposes.  Claimant's prior record concerning controlled substances has likewise involved small amounts of marijuana and there have not been any charges or convictions for possessing controlled substances with the intent to

distribute them.  Moreover, the California trip was drawing to a close when Claimant was stopped in Western Kansas, and the only marijuana found in the car weighed less than 2 ounces.  While Claimant and Shelton admitted that they had already consumed some of the marijuana they purchased in Fort Collins, there is no indication that the total amount of marijuana they purchased there was substantial.  Finally, without purchasing additional plastic bags, Claimant did not have the means to package more than 30 bags.  These facts distinguish the present case from many of the other currency forfeiture cases where law enforcement officers had evidence that the moneys seized were either proceeds of drug sales, *see e.g.*, United States v. $4,629 in U.S. Currency, 359 F.Supp.2d 504, 509 (W.D.Va. 2005) (funds seized included marked currency used by an informant to make a controlled purchase of crack cocaine), or were funds to be used in a sizeable drug purchase which had been discovered by law enforcement officers from wiretaps, informants or other sources.  *Cf.*, United States v. Gaskin, 364 F.3d 438, 462 (2nd Cir. 2003) (where Defendant in a criminal forfeiture proceeding had brought $20,000 with him to a site where he expected to take delivery of a large quantity of marijuana).

     As a result, the Court finds that the Government has established by a preponderance of the evidence that $18,000 of the seized currency was intended to be used to facilitate the purchase of controlled substances and the Government is

entitled to forfeiture of that amount.  The Government has not, however, presented sufficient evidence to establish by a preponderance of the evidence that the remaining portion of the funds were intended to facilitate the purchase of controlled substances, and the Government is therefore not entitled to forfeiture of the entire sum seized.[7]

---

[7] While the Court believes that the evidence discussed above supports its conclusion in this case that the entire sum is not subject to forfeiture, a similar result could be reached in certain circumstances by application of the proportionality provisions of CAFRA, 18 U.S.C. § 983(g).  Subsection 983(g)(4) provides that "If the court finds that the forfeiture is grossly disproportional to the offense it shall reduce or eliminate the forfeiture as necessary to avoid a violation of the Excessive Fines Clause of the Eight Amendment of the Constitution." An excessive fine analysis in connection with forfeiture proceedings actually predates this statutory provision of CAFRA.  *See e.g.*, United States v. 829 Calle de Madero, Chaparral, N.M., 100 F.3d 734, 738 (10th Cir. 1996); United States v. Wagoner County Real Estate, 278 F.3d 1091, 1101 (10th Cir. 2002); United States v. Bajakajian, 524 U.S. 321, 334, 118 S.Ct. 2028, 141 L.Ed.2d 488 (1998).  In fact, this CAFRA provision essentially codifies the proportionality test established by the Supreme Court in Bajakajian.  *See* United States v. $293,316 in U.S. Currency, 349 F.Supp.2d 638, 646 (E.D.N.Y. 2004).

Court's applying this CAFRA provision, 18 U.S.C. § 983(g)(1), have noted that the burden is on the Claimant to petition the Court to determine whether the forfeiture was excessive.  *See* Von Hofe v. United States, 492 F.3d 175, 183 (2nd Cir. 2007).  If such a petition is made, the Court is to conduct a hearing on the issue and the burden is on the Claimant to establish by a preponderance of the evidence that the forfeiture is grossly disproportional.  *Id.*; 18 U.S.C. §983(g)(3).  Here, Claimant did not petition for such a hearing nor did the Pretrial Order raise any issue of excessiveness under the Eighth Amendment.  Therefore, the Court is not reaching the result in this case based on any proportionality analysis.  The fact that Congress has included a proportionality provision in CAFRA, however, supports a conclusion that forfeitures are not necessarily an all-or-nothing situation.

CONCLUSION

For the reasons set forth above, the Court finds that the Government has established by a preponderance of the evidence that $18,000 of the seized currency was intended to be used by Claimant to facilitate the purchase of controlled substances and the Government is entitled to forfeiture of that amount. The remaining amount of currency which was seized, $13,423[8] shall be returned to Claimant.[9]

The costs of this action are assessed to Claimant.

IT IS SO ORDERED.

Dated this 30th day of May, 2008.

   s/   DONALD W. BOSTWICK
U.S. MAGISTRATE JUDGE

---

[8] $30,860 seized from the trunk, plus $563 seized from Claimant's person, less the $18,000 to be forfeited to the United States.

[9] Claimant also requested return of his 9mm Lugar, the heat sealer and the scales. These are not the subject of this forfeiture action and Claimant must seek their return through other legal means.